Rel: July 17, 2026

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## SPECIAL TERM, 2026

_____

### CL-2025-0868

_____

**Breanne R. Brazeale**

**v.**

**Joseph M. Gibson**

**Appeal from DeKalb Circuit Court**
**(DR-21-28.01)**

EDWARDS, Judge.

Breanne R. Brazeale ("the mother") appeals from a judgment of the DeKalb Circuit Court ("the trial court") denying her petition to modify a November 2021 judgment awarding her and Joseph M. Gibson ("the father") joint physical custody of their children, Z.G. ("the eldest child"),

I.G. ("the middle child"), and M.G. ("the youngest child").[1]  For the reasons set forth below, we affirm the trial court's judgment.

The parties were never married, but they were engaged in a long-term relationship that resulted in the birth of the eldest child, the middle child, and the youngest child ("the children").  The record indicates that the parties' relationship ended sometime before November 2021 and that, afterward, a case was initiated regarding the custody of the children and child support.  In November 2021, the trial court entered a judgment awarding the parties "true joint physical custody" of the children, with the parties exercising custody on an alternating weekly basis, and awarding the mother sole legal custody of the children.  According to the record, the parties were also required to "abstain from alcohol, marijuana, or any other illicit drug(s)."  Additionally, each party was ordered to "maintain a healthy living environment and abstain from talking negatively about the other parent to the children."

On June 25, 2024, the mother filed in the trial court a verified petition seeking sole physical custody of the children and seeking to hold

---

[1]At the time of the June 2025 trial, the eldest child was 11 years old, the middle child was 7 years old, and the youngest child was 5 years old.

the father in contempt based on allegations that the father had "engaged in a campaign of abusive behavior and neglect" toward the children, had threatened the children, and had violated several provisions of the November 2021 judgment. The mother also filed a motion for pendente lite custody of the children. The father, acting pro se, filed a handwritten answer to the mother's petition and the motion for pendente lite custody of the children. He generally denied the mother's assertions and claimed that the mother had emotionally harmed the eldest child and that she had "allowed" her husband, Steve Brazeale ("the stepfather"), to physically harm the eldest child. The father also alleged that the mother had "continually engaged" in efforts to alienate the children from him.

On November 18, 2024, the trial court held a hearing on the mother's motion for pendente lite custody, at which it received ore tenus evidence. Dr. Julie Lindner, a mental-health counselor who was accepted by the trial court as an expert in child psychology, testified at the pendente lite hearing that she had been the eldest child's counselor since September 2022 and that the eldest child had "expressed extreme distress" regarding the conditions in the father's residence. Dr. Lindner also reported that the eldest child had harmed herself and had exhibited

3

signs of anxiety regarding how the father reared the children. She explained that the eldest child had reported that the father drank to excess and had left the children alone for extended periods. Dr. Lindner also stated that the eldest child had reported that the father's residence was unsanitary and infested with insects. She opined that the joint-custody schedule set forth in the November 2021 judgment was not a "healthy arrangement" for the children.

The eldest child testified at the pendente lite hearing that the father had consumed alcohol in the children's presence, that she had seen him "truly drunk" on at least two occasions, and that the father's cigarettes had occasionally brushed against the children.[2] She also reported that the children tried to keep the father from becoming upset because the father became "scary" when he was angry. According to the eldest child, the father had discussed with the children what she described as "scary things," such as people cannibalizing children, the presence of insects in the children's food, and people wanting to kidnap the children and harm them. The eldest child generally stated that the

---

[2]The eldest child stated that the father's cigarettes had not burned the children but that the contact with a cigarette had resulted in a small amount of pain.

4

father's residence was not dirty and that she had fun at the father's residence. She also testified that the father mocked and teased the children.

With respect to the mother's residence, it appears that the mother primarily resided with her mother, the maternal grandmother of the children, in Fort Payne but frequently traveled with the children to Gilmer County, Georgia, to spend time with the stepfather. The eldest child reported that she enjoyed staying with the mother. However, the eldest child also reported that she was afraid of the stepfather and recounted two separate incidents during which he had made her feel unsafe.

The eldest child stated that the stepfather had picked her up "by the crotch and squeezed [her] very tight." The mother explained that the eldest child had not wanted to go with the father during a custody exchange and that the stepfather had "scooped her up" to give the eldest child to the father and that he had put the child down when she had expressed that she was in pain. The eldest child testified that, on a different occasion at the stepfather's residence, the stepfather had thrown her on the couch hard enough to hurt her head because, she said,

5

she had been "throwing a terrible fit." According to the eldest child, the mother had not permitted the eldest child to contact the father after that incident. The mother explained that the eldest child had become agitated and had hit her. In response, the mother said, the stepfather had "plopped" the eldest child on a couch, had held her hands, and had told her that she would not be permitted to hit the mother. The record indicates that the father reported those incidents to the Alabama Department of Human Resources, the Georgia Department of Human Services, Division of Family and Children Services, and the Gilmer County, Georgia, Sheriff's Department. The record further indicates that each agency investigated the father's allegations and found no evidence of wrongdoing. The eldest child stated that she did not know if she had a preference regarding with which parent she would prefer to live pending the outcome of the litigation.

The mother stated that she believed that the children were not safe with the father and that the children often returned from the father's custodial periods dehydrated, with blistered skin, and with cold sores. The mother also testified that the father provided the children with expired or spoiled food. She also stated that the eldest child's mental

6

health had deteriorated since the parties' separation and that the father had discussed what the mother perceived to be inappropriate topics with the children, such as death tolls from natural disasters and "what the [g]overnment is doing to everyone."

On November 19, 2024, the trial court entered an order denying the mother's request for pendente lite custody. On March 21, 2025, the mother filed a new motion seeking pendente lite custody of the children based on concerns raised by Dr. Lindner concerning the welfare of the children. On April 1, 2025, the mother "renewed" her March 21, 2025, motion and included a request for an emergency pickup order.[3] The trial court denied the mother's pendente lite motion and renewed pendente lite motion on April 23, 2025. The trial court held a trial on the mother's petition on June 10, 2025, at which it received ore tenus evidence. The following evidence was produced at trial.

The father said that he was a "handyman," that he was employed on a job-by-job basis, and that he primarily worked on residential

---

[3]This motion was supported by an affidavit from Dr. Lindner that the mother requested be reviewed by the trial court in camera. That affidavit does not appear in the record.

projects.[4]   He explained that he did not have any certifications or specialized training and that he usually earned approximately $1,750 each month.[5]  However, the father testified that his earning potential was limited by the November 2021 judgment's custody schedule because, he asserted, it was difficult to obtain jobs that permitted him to miss alternating weeks.  The father also stated that his income was reduced during the winter months but that he saved money during his busier months to offset his reduced income.  The father testified his monthly expenses were between $1,030 and $1,240 each month.[6]

The father stated that he generally had $100 each week to spend on food for himself and the children when they were in his custody.  The mother asserted that the father did not provide the children with adequate nourishment and that the children often returned to her custody hungry.  The eldest child also insinuated that the father had

---

[4]The father explained that he had worked as a carpenter, plumber, electrician, and painter.

[5]The father stated that he typically earned less than $1,000 per month during the winter months because he had less work.

[6]The father explained that he paid $450 per month in rent, up to $300 per month for utilities, and $50 per month for telephone and Internet services.  He also spent between $30 and $40 per month making his own cigarettes.

occasionally provided the children with expired food. The father explained that he purchased food at "discount grocery places" and denied that he had provided the children with expired food. He did concede that he had occasionally provided the children with food that was past the product's "best used by" date.

The mother primarily expressed her concern about the children's physical and mental well-being while in the father's custody. The mother stated that the father belittled the children and focused much of his belittlement on the eldest child. She testified that the father regularly drank alcohol in front of the children and had left the children alone in his residence while he traveled to purchase alcohol. She further accused the father of discussing various "conspiracy theories" with the children. Those "conspiracy theories" included the federal government's supposed effort to put "cricket powder" in the consumer food supply, the possibility that Abraham Lincoln was an alien, and the federal government's having deployed a "directed energy weapon" in Maui, Hawaii, to start fires in residential areas of Maui as part of a plan to remove "the poor in Hawaii." The mother also complained that the father had permitted the children to watch movies the Motion Picture Association rated as "restricted" that

featured sexual conduct and extreme violence and gore. The mother stated that the father had told the children that they could be abducted by foreigners and sold into slavery or that their organs could be harvested. She further asserted that the father had told the children that the mother would permit the stepfather to sell them to his friends and that the stepfather planned to sexually abuse the children.

The mother testified that the father's conduct had negatively impacted the children's mental health and spoke specifically about the eldest child's mental well-being. She explained that the eldest child frequently had nightmares and panic attacks because of the father's behavior and comments. She also stated that the eldest child had compulsively examined the food at the mother's residence for "cricket powder" and that the eldest child had demanded to smell people's breath to determine if they had been consuming alcohol. The mother also reported that the eldest child had tried to throw herself through a window and had engaged in self-harm by hitting herself, by pulling out her own hair, and by placing her hand in boiling water. The mother further stated that the eldest child had told the mother that she wanted to die.

The eldest child testified at the trial that the father had discussed with the children the conspiracy theories mentioned in the mother's testimony and that he had made comments to the eldest child that she considered to be belittling. The eldest child stated that the father had advised her not to wear a bra because he believed that bras could cause breast cancer by restricting blood flow. She also testified that the father had discussed the ongoing litigation with the children and that one discussion had lasted until 3:30 a.m. The eldest child testified that the father had indicated that he would be "very, very sad" if the mother was awarded sole physical custody of the children and that he might remove the children's belongings from his home if they were not going to be living with him. However, she testified that the father had not directed her on how she should testify and that her testimony was indicative of her own thoughts and beliefs.

The eldest child stated that she would "suck up" to the mother, which appears to have included disparaging the father's residence and his conduct, to obtain preferential treatment from the mother. She testified that she enjoyed being with the father, that she felt safe with the father, that the father had been attentive to the children and their

11

needs, and that she would prefer that the parties maintain joint physical custody of the children. In addition, the eldest child restated that she did not feel safe with the stepfather.

Dr. Lindner testified that, during their counseling sessions, the eldest child had described many of the father's behaviors about which the mother had testified. Dr. Lindner stated that the mother had been present during many of the eldest child's counseling sessions but that she had requested that the mother wait outside on several occasions so that the eldest child could speak with her outside of the mother's presence.[7] She also reported that the eldest child had informed her that the father had required the eldest child to "promise to God" that she would request that the trial court maintain the parties' joint-physical-custody arrangement. Dr. Lindner also opined that parts of the eldest child's testimony appeared to be rehearsed and that the eldest child had told her that she was afraid that she would upset the father if the mother's petition was granted. Dr. Lindner further stated that the eldest child had reported in her counseling sessions that she did not wish to live with the father. Dr. Lindner expressed her belief that, based on her

---

[7]The eldest child stated that the mother occasionally had spoken privately to Dr. Lindner after her counseling sessions had ended.

12

observations made during the father's testimony, the father might benefit from "psychological help."

The father largely denied the mother's characterizations of his actions. He conceded that he had consumed alcohol in front of the children on occasion and that he had occasionally left the children alone to travel to purchase alcohol. However, he denied being overly intoxicated in the children's presence and asserted that the children were never alone for more than approximately five minutes. The father attempted to clarify his statements to the eldest child regarding removing the children's belongings by testifying that, if the mother obtained sole physical custody of the children and if he could not "afford to pay all these bills that she's trying to put on [him]," he might "have to leave the country and go live on some island somewhere, and then I'll just let y'all know where I'm at so when you get old enough you can come live with me on the island."

The father also testified that many of the "conspiracy theories" that the mother claimed he subscribed to were topics that he had researched using various academic journals or professional publications, and he attempted to contextualize some of his comments. For example, the

father testified that his comments about "cricket powder" were part of a discussion on "pay[ing] attention to what we eat." He also explained that the eldest child had inquired about the "directed energy weapons" after she had overheard a video on his telephone about the devices and that he had informed her that he believed that such weapons were possible and had shown her videos regarding the supposed use of those weapons in Hawaii. The father admitted that he had shown the children movies featuring violent content and what he described as "alien gore," but he denied showing them movies with sexually explicit scenes.

The mother also complained that the father was not adequately attending to the children's education. It appears that the parties had previously agreed to homeschool the children. The mother explained that she utilized "The Good and The Beautiful," which she described as a "nondenominational, Christian-based homeschooling" program, for the children's math and language-arts coursework and that she added material from other programs as necessary. She stated that the children's normal school day involved workbooks and studying until

14

lunch, followed by outdoor activities or a trip to a park or library.[8] She further stated that she attempted to incorporate the children's interests into the curriculum.

The mother asserted that, in contrast to her structured curriculum, the father practiced "unschooling," which appears to be a form of education in which no formal curriculum is followed and in which each pupil is allowed to pursue his or her individual interests. The eldest child described the father's homeschooling efforts as "hippie" and that "we just learn about stuff, and we Google and we take pictures and learn photography and videography and stuff like that." The father explained that he had previously used workbooks that he had acquired at thrift stores when homeschooling the children. However, the father acknowledged that he had indefinitely suspended the use of those workbooks and had begun "unschooling" the children one year before the trial. When asked to explain his "unschooling" process, the father described a hypothetical scenario in which one of the children became interested in a plant. The father explained that he and the child would

---

[8]The eldest child stated that the children were engaged in actual coursework approximately four hours each day between Monday and Friday.

15

"look [the plant] up" and "learn all the facts about it." It appears that the father primarily relied on online search engines to facilitate any research necessary to accomplish the learning aspect of "unschooling." The father also stated that he used nature documentaries and social-media videos to educate the children.

The father asserted that he had suspended the children's formal education because he believed that he was teaching the children material that was more advanced than the material that the mother was teaching the children and also because he was waiting for the mother's curriculum to progress to the academic level that he believed the children had obtained. For example, the father testified that the eldest child could solve complex multiplication problems and that the youngest child had been able to count to 100 and to recite the alphabet when he was three years old. However, the father claimed that, at the time of the June 2025 trial, the mother's curriculum required the eldest child to continue doing basic addition and that the youngest child had regressed in his academic ability because the mother did not focus on his studies.

The father stated that he believed that the mother vilified him to the children and that the parties had a difficult time coparenting. He

16

also asserted that the mother's eventual goal was to obtain sole physical custody of the children so that she could relocate the children to the stepfather's residence in Georgia. The father also asserted that the mother was "as much of a conspiracy theorist" as he was and that she supported not vaccinating the children.

On June 17, 2025, the trial court entered a judgment that, among other things, denied the mother's petition insofar as she sought to modify the children's custody. The mother filed a timely Rule 59, Ala. R. Civ. P., postjudgment motion directed at the June 2025 judgment. The mother asserted in her postjudgment motion that the trial court's judgment did not indicate what custody-modification standard the trial court had applied and that the trial court should have applied the best-interest-of-the-child standard set out in Ex parte Couch, 521 So. 2d 987 (Ala. 1988). The mother also asserted that the evidence before the trial court demonstrated that it would be in the children's best interests for the trial court to award the mother sole physical custody of the children. The trial court held a hearing on the mother's postjudgment motion, at which it received arguments from the parties, including arguments regarding the application of the best-interest-of-the-child standard. The trial court

17

subsequently denied the mother's postjudgment motion. The mother appeals.

The mother first argues that the trial court's judgment fails to identify the custody-modification standard that it applied to the present case and requests that this court remand the case to the trial court so that it may apply the best-interest-of-the-child standard set forth in Couch. Initially, we note that

> "[d]ecisions regarding child custody and its subsequent modification are committed to the sound discretion of the trial court, and any child custody order based on evidence presented ore tenus is accorded a presumption of correctness on appeal. Jones v. Sprinkle, 621 So. 2d 1341, 1342 (Ala. Civ. App. 1993). This court will not reverse unless it concludes that the order is so lacking in evidentiary support as to be plainly and palpably wrong, or unless it finds an abuse of the trial court's discretion. Phillips v. Phillips, 622 So. 2d 410, 412 (Ala. Civ. App. 1993).

> "The appellate courts in Alabama use two different standards when reviewing custody determinations. Ex parte Couch, 521 So. 2d 987, 989 (Ala. 1988). When custody is decided initially, then the appropriate standard is the child's best interest. See Murphy v. Murphy, 479 So. 2d 1261 (Ala. Civ. App. 1985). If a prior judgment has granted custody to one parent, however, then the parent seeking a change in custody bears the burden of proving not only that a material change in circumstances has occurred since the prior order, but also that a change in custody will materially promote the child's best interest and that the benefits of a change in custody will overcome the inherently disruptive effect caused by uprooting the child. See Ex parte McLendon, 455 So. 2d

18

863 (Ala. 1984). In a case such as this, where the parties initially shared joint legal and physical custody, our supreme court has determined that upon review of a subsequent designation of a primary physical custodian, the 'best interest' standard is applicable. Couch, 521 So. 2d at 989. We note that the ... McLendon standard is more stringent."

I.M. v. J.P.F., 668 So. 2d 843, 845 (Ala. Civ. App. 1995).

The record clearly indicates that the November 2021 judgment awarded the parties joint physical custody of the children. Thus, the Couch standard is the appropriate standard to be applied in this case. See also E.F.B. v. L.S.T., 157 So. 3d 917, 923 (Ala. Civ. App. 2014) (holding that the best-interest-of-the-child standard applied when, under previous custody judgment, the parties had been awarded "joint physical custody" and had exercised custody over the children for an approximately equal amount of time). Although the trial court did not specifically state that it was applying the Couch standard, this court

"'will not presume error on the part of the trial court,' Pickett v. Pickett, 792 So. 2d 1124, 1128 (Ala. Civ. App. 2001), nor do we require a trial court to set forth 'conclusions of law in its final order unless a statute specifically requires it to do so,' Taylor v. Taylor, 387 So. 2d 849, 852 (Ala. Civ. App. 1980); see also Rule 52, Ala. R. Civ. P."

McElheny v. Peplinski, 66 So. 3d 274, 280 (Ala. Civ. App. 2010). The trial court was presumed to know and properly apply the law in adjudicating

the mother's petition to modify custody and in denying the mother's postjudgment motion, which specifically addressed the proper custody-modification standard. See Gallant v. Gallant, 184 So. 3d 387, 402 (Ala. Civ. App. 2014). Thus, the record, viewed as a whole, indicates that the trial court applied the Couch standard, which, as discussed above, is the appropriate standard in the present case.

The mother next argues that the trial court's judgment denying her petition to modify the physical custody of the children is not supported by the record.

> "'"In matters concerning child custody …, the trial court's judgment is presumed correct … and will not be reversed unless plainly and palpably wrong." Ex parte T.L.L., 597 So. 2d 1363, 1364 (Ala. Civ. App. 1992).
>
> > "'"The ore tenus rule provides that a trial court's findings of fact based on oral testimony 'have the effect of a jury's verdict,' and that '[a] judgment, grounded on such findings, is accorded, on appeal, a presumption of correctness which will not be disturbed unless plainly erroneous or manifestly unjust.' Noland Co. v. Southern Dev. Co., 445 So. 2d 266, 268 (Ala. 1984). 'The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses.' Hall v. Mazzone, 486 So. 2d 408, 410 (Ala. 1986)."

"'Ex parte Anonymous, 803 So. 2d 542, 546 (Ala. 2001). "The trial court's judgment in cases where the evidence is heard ore tenus will be affirmed, if, under any reasonable aspect of the testimony, there is credible evidence to support the judgment." River Conservancy Co., L.L.C. v. Gulf States Paper Corp., 837 So. 2d 801, 806 (Ala. 2002). Accord Clark v. Albertville Nursing Home, Inc., 545 So. 2d 9, 13 (Ala. 1989). "In ore tenus proceedings, the trial court is the sole judge of the facts and of the credibility of the witnesses, and it should accept only that testimony which it considers worthy of belief." Clemons v. Clemons, 627 So. 2d 431, 434 (Ala. Civ. App. 1993).

"'"'Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court ....'" Ex parte Roberts, 796 So. 2d 349, 351 (Ala. 2001) (quoting Ex parte Bryowsky, 676 So. 2d 1322, 1324 (Ala. 1996)). "When the evidence in a case is in conflict, the trier of fact has to resolve the conflicts in the testimony, and it is not within the province of the appellate court to reweigh the testimony and substitute its own judgment for that of the trier of fact." Delbridge v. Civil Serv. Bd. of Tuscaloosa, 481 So. 2d 911, 913 (Ala. Civ. App. 1985). "[A]n appellate court may not substitute its judgment for that of the trial court. To do so would be to reweigh the evidence, which Alabama law does not allow." Ex parte Foley, 864 So. 2d 1094, 1099 (Ala. 2003) (citations omitted).'"

B.C.H. v. M.H., 323 So. 3d 661, 671 (Ala. Civ. App. 2020) (quoting Ex parte R.E.C., 899 So. 2d 272, 279 (Ala. 2004)).

"In considering the best interests of the child, the court must consider the individual facts of each case, including the following factors: the sex and age of the child; the child's emotional, social, moral, material, and educational needs; the home environments offered by the parties; the characteristics of those seeking custody, including age, character, stability,

21

and mental and physical health; the capacity and interest of each parent to provide for the emotional, social, moral, material, and educational needs of the child; the interpersonal relationship between the child and each parent; the effect on the child of disrupting or continuing an existing custodial status; the preference of the child; available alternatives; and any other relevant matter the evidence may disclose."

Morgan v. Morgan, 964 So. 2d 24, 34 (Ala. Civ. App. 2007). Additionally, we note that the preference of a child whose custody is at issue "is an important factor for the trial court to consider in a custody modification case," although that preference is not controlling. S.R. v. S.R., 716 So. 2d 733, 735-36 (Ala. Civ. App. 1998).

The mother presented evidence at trial to support her assertions that the father did not adequately care for the children and that the eldest child in particular suffered from mental-health issues, which the mother and Dr. Lindner attributed to the father's rearing of the children. Although the father agreed with the mother that he had engaged in certain actions and conduct, he disputed the mother's contention that his conduct had had a negative impact on the children. The father also testified, without further explanation, that he believed that the mother shared many of his beliefs and that, if the mother obtained sole physical custody, she would attempt to relocate the children to the stepfather's

22

residence in Georgia, which, the father asserted, would make it financially difficult for him to visit the children.

In addition, the eldest child testified that she enjoyed being with the father and that she would prefer to continue the custody arrangement as set forth in the November 2021 judgment. She stated that she felt safe in the father's custody and that she did not feel safe with the stepfather. The eldest child also admitted to manipulating the mother, which appears to have involved disparaging the father and his residence to the mother, to obtain preferential treatment while in the mother's custody. The record also indicates that the mother had spoken negatively about the father to the children and had occasionally prevented the children from contacting the father.

It was the province of the trial court to weigh the conflicting testimony the parties presented, and we will not substitute our judgment for that of the trial court. The trial court could have believed that the eldest child's behavior toward, and discussions with, the mother were merely an attempt to curry favor with the mother to obtain preferential treatment. In addition, the child repeatedly stated that she did not feel comfortable or safe with the stepfather. Further, the mother offered no

23

evidence to support her assertion that the children went hungry in the father's care. The trial court could have determined that, although the father was certainly not a model parent and the mother had raised legitimate concerns regarding the children's education, the mother had failed to demonstrate that relegating the father to the status of noncustodial parent would be in the children's best interest. See Watters v. Watters, 918 So. 2d 913, 916 (Ala. Civ. App. 2005) (recognizing that "our legislature has indicated that joint-custody arrangements are favored, Ala. Code 1975, § 30-3-150, and should be considered in every child-custody case, Ala. Code 1975, § 30-3-152(a)"). Accordingly, we affirm the judgment of the trial court denying the mother's petition to modify the children's physical custody.

AFFIRMED.

Fridy, J., and Minor, Special Judge,* concur.

Hanson, J., dissents, with opinion, which Bowden, J., joins.

Moore, P.J., recuses himself.

---

*Because one judge recused himself and two judges dissented, Judge Richard J. Minor of the Alabama Court of Criminal Appeals was appointed to serve as a Special Judge in this appeal.

24

HANSON, Judge, dissenting.

Breanne R. Brazeale ("the mother") appeals from a judgment entered by the DeKalb Circuit Court ("the trial court") denying her petition to modify custody of the parties' children. For the reasons stated herein, I dissent from the majority's decision to affirm the trial court's judgment.

In November 2021, the trial court entered a judgment granting the mother and Joseph M. Gibson ("the father") joint physical custody of their three children. In June 2024, the mother filed a petition that, among other things, sought sole physical custody of the children subject to the father's supervised visitation. After conducting a final hearing, the trial court entered a final judgment denying the mother's petition to modify custody of the children.

On appeal, the mother argues that the record did not reveal, and that the final judgment did not identify, the custody-modification standard the trial court applied in denying her petition. She requests that this court reverse the judgment and remand the case for the trial court to apply the standard set forth in Ex parte Couch, 521 So. 2d 987 (Ala. 1988), to the evidence.

The majority opinion affirming the judgment recognizes that the Couch standard is the applicable trial-court standard, stating:

> "'The appellate courts in Alabama use two different standards when reviewing custody determinations. Ex parte Couch, 521 So. 2d 987, 989 (Ala. 1988). When custody is decided initially, then the appropriate standard is the child's best interest. See Murphy v. Murphy, 479 So. 2d 1261 (Ala. Civ. App. 1985). If a prior judgment has granted custody to one parent, however, then the parent seeking a change in custody bears the burden of proving not only that a material change in circumstances has occurred since the prior order, but also that a change in custody will materially promote the child's best interest and that the benefits of a change in custody will overcome the inherently disruptive effect caused by uprooting the child. See Ex parte McLendon, 455 So. 2d 863 (Ala. 1984). … [W]here the parties initially shared joint legal and physical custody, our supreme court has determined that upon review of a subsequent designation of a primary physical custodian, the "best interest" standard is applicable. Couch, 521 So. 2d at 989. We note that the … McLendon standard is more stringent.'
>
> "I.M. v. J.P.F., 668 So. 2d 843, 845 (Ala. Civ. App. 1995).
>
> "The record clearly indicates that the November 2021 judgment awarded the parties joint physical custody of the children. Thus, the Couch standard is the appropriate standard to be applied in this case. See also E.F.B. v. L.S.T., 157 So. 3d 917, 923 (Ala. Civ. App. 2014) (holding that the best-interest-of-the-child standard applied when, under previous custody judgment, the parties had been awarded

'joint physical custody' and had exercised custody over the children for an approximately equal amount of time)."

___ So. 3d at ___. The majority concludes that the trial court applied the Couch standard, opining:

"Although the trial court did not specifically state that it was applying the Couch standard, this court

"'"will not presume error on the part of the trial court," Pickett v. Pickett, 792 So. 2d 1124, 1128 (Ala. Civ. App. 2001), nor do we require a trial court to set forth "conclusions of law in its final order unless a statute specifically requires it to do so," Taylor v. Taylor, 387 So. 2d 849, 852 (Ala. Civ. App. 1980); see also Rule 52, Ala. R. Civ. P.'

"McElheny v. Peplinski, 66 So. 3d 274, 280 (Ala. Civ. App. 2010). The trial court was presumed to know and properly apply the law in adjudicating the mother's petition to modify custody and in denying the mother's postjudgment motion, which specifically addressed the proper custody-modification standard. See Gallant v. Gallant, 184 So. 3d 387, 402 (Ala. Civ. App. 2014). Thus, the record, viewed as a whole, indicates that the trial court applied the Couch standard, which, as discussed above, is the appropriate standard in the present case."

___ So. 3d at ___.

I acknowledge our well-established caselaw holding that a trial court is presumed to know and follow the law and that an appellate court cannot presume that a trial court has erred. Gallant v. Gallant, 184 So. 3d 387, 402 (Ala. Civ. App. 2014); Carter v. Carter, 666 So. 2d 28, 30 (Ala.

27

Civ. App. 1995). Indeed, "[e]rror asserted on appeal must be affirmatively demonstrated by the record." Greer v. Greer, 624 So. 2d 1076, 1077 (Ala. Civ. App. 1993). Accordingly, this court cannot reverse a trial court's judgment based on a silent record. I further recognize that our caselaw currently requires this court to apply this presumption in our review of custody determinations. Gallant, supra; and Ex parte City of Orange Beach, 430 So. 3d 41, 49 (Ala. 2025)(recognizing that the doctrine of stare decisis compels "respect for prior precedent, even prior precedent that was decided incorrectly, so as to provide stability in the law"). However, considering the lifelong impact custody determinations have on parties and children, I question the wisdom of the application of this presumption when reviewing custody determinations.

From my review of the record "as a whole," I cannot discern with definitiveness that the trial court applied the Couch standard. To determine which standard the trial court applied, "a reviewing court should look to both the judgment and the record in ascertaining whether the trial court has applied the proper substantive custody-modification standard." L.W. v. B.C.D., 364 So.3d 999, 1003 (Ala. Civ. App. 2022). In this case, nothing in the record provides clarity as to which standard the

trial court applied in making this custody determination. The best-interest standard is not mentioned in the record until <u>after</u> the trial court entered its final judgment, i.e., only when the mother placed the issue of which standard the trial court applied squarely before the trial court in her postjudgment motion. Counsel discussed the applicable standard at the postjudgment hearing, but the trial court did not indicate at the hearing which standard it had applied in making its decision. The trial court also did not address the issue in its postjudgment order; instead, it entered an order summarily denying the motion. In my opinion, considering the lack of clarity at the final hearing regarding the standard to be applied, the mother's pointed argument in her postjudgment motion and at the postjudgment hearing regarding the applicable standard, and the trial court's failure at any stage in the proceedings to address whether it had applied the <u>Couch</u> standard, application of the presumption in this case is improper. Thus, considering the facts and circumstances presented in this case, I do not believe that application of the presumption is appropriate. See <u>L.B. v. V.T.W.</u>, 387 So. 3d 1157 (Ala. Civ. App. 2023). Furthermore, because the <u>Couch</u> standard is a less stringent standard, I cannot conclude from my review of the evidence

that this error is harmless. See <u>Nelson v. Maddox</u>, 270 So. 3d 1178, 1183-84 (Ala. Civ. App. 2018).

I observe that, had the trial court indicated the standard it applied at the final hearing, in its final judgment, at the postjudgment hearing, or in its order denying the mother's postjudgment motion, the record would have provided clarity and needless litigation would have been avoided. I encourage trial courts to identify the standard being applied on the record and/or in their judgments and to address issues, especially issues that are squarely presented, to prevent costly litigation for the parties and to facilitate meaningful review by this court.

Bowden, J., concurs.